Chief Justice Robertson,
delivered the opinion of the court.
The commonwealth prosecutes this writ of error, to reverse a judgment rendered in favor of Burns, on an indictment with three counts, charging him with setting up a gaming table, and with keeping a gaming table, and with keeping a bank in violation of the act of 1823, “more effectually to suppress gaming.”
As we aré of opinion, that each count is good, and that the evidence, if it would have authorized a verdict of “guilty” on any count which could be drawn for a violation of the act of 1823, would have justified conviction on one of the counts in this indictment, the instructions of the circuit court, to the jury will aloné be considered;
A witness for the commonwealth swore, that having gone into a room in Frankfort, where a man named Grear, was at a gaming table, dealing cards in a game called “Faro,” he bet a dollar, which, after it had been won by the bank, Burns picked up and put into his *178 pocket, observing, when asked why he did so, “it is all mine.” That soon after this, Burns “took his seat and aided in counducting the game, paying off the debts lost by the bank, and taking into the bank those won by the bank, Grear still dealing during this time.”
It was proved, that it had been usual, when there were many betters at a Faro bank, for one person to deal the cards, and another, to pay and receive the bets.
The bill of exceptions states, that Burns “gave evidence conducing to show, that the dollar taken up by him, was what Faro dealers call “a sleepy bet,” which any by-stander might take up and keep; and also, evidence conducing to prove, that the bank was Grear’s, who was dealing, and that the defendant only aided him in carrying on the game, and in paying out and taking in the bets through courtesy and friendship, as is frequent with by-standers.”
Upon the foregoing evidence, the attornies for the commonwealth, moved the court to instruct the jury, that “if they believe, from the evidence, that the defendant aided the said Grear in carrying on the game, and keeping the bank, by paying out bets won by the betters, and taking into the bank those that they lost, they should find for the commonwealth.”
The courtrefused to give this instruction,but gave the following. “That the main object of the legislature, was to put down gaming for profit; and that if they believed from the evidence, that the defendant had no interest in the game thus played, and that he assisted only on the particular occasion out of courtesy or friendship to Grear, or even dealt the cards for Grear, through friendship or courtesy, having no interest in the game, and not being connected with it by any agreement, but only casually thus acting; he did not come within the penalties of the act of assembly; and that if the commonwealth had proved, that the defendant did so aid in managing the game, this evidence prima facie only subjected the defendant, that it lay on him to show that he had no interest therein, and that he did it to oblige Grear, and the by-standers.”
The correctness of the opinion of the circuit courts must be tested by the first section of the act of 1823, *179 for the suppression of gaming. As much of that section as can be necessary, for ascertaining the intention of the legislature, is as follows. “That hereafter, if any person, or persons shall set up, or keep any gaming table, at which the game of Faro, Equality, or any other game of chance, shall be played for money or any other thing, or shall keep any bank, and shall induce or permit any person, or persons to bet any money, or any other thing against the said bank or game, each and every person so offending, &c.”
The object of the act of 1823, “more effectually to suppress gaming.”
On a minute analysis of the foregoing phraseology, it will be found, .that there will be some difficulty in giving, to it a precise, and well defined interpretation. In ordinary cases, there will be no difficulty in effectuating the object of the statute, by applying it to. the facts, with satisfactory certainty..
But many cases may arise, in which the courts might be very much perplexed in deciding, by any certain or distinct construction of the statute, whether thé facts proved, amount to any offence within- its prohibition. The language which has been quoted, is not as precise or perspicuous as that which should-be employed in the announcement of law, and more -especially penal law; The object of the legislature, was not to suppress gaming generally; but to proscribe a particular species of gambling, by punishing, rigorously, a notorious class of professional gamblers.. Former laws were deemed sufficient for discountenancing the ordinary games of chance. But a more public and severe sanction, was ascertained to be necessary for the extirpation of a vice, which had taken deep root, and was seen and felt to be peculiarly pernicious, and demoralizing.
For this purpose the act of 1823,, was passed. It must be construed as a penal statute, framed for the conservation of domestic morality and social order.
There can be no doubt, that the legislature intended, as far as possible-, to break up, what is usually denominated, gaming tables or hanks;- and this useful purpose, they have proposed to accomplish, by operating on the ■ fears and the avarice of those alone, who might be disposed to “set up or keep” such establishments. To effectuate this object, and prevent evasion, a copiousness of description has been attempted in the inhibitory clause, which tends to obscure its true meaning.
Setting up, or keeping a gaming table] or bank, at which money pr any thing, shall be bet, js a violation-of the act of 1823.
Setting up a gaming t^ble, defined.
V A gaining table” may ■be setup without money or property to stake on the game, credit may bp substituted.
1. Does the statute define three distinct offences, or s; the description made ample, merely to identify a specific act, in different forms, so as to render it difficult, to evade the penalty?
2. What is the proper meaning of the terms “set up” and “keep a gaming table”?
3. What is necessary to constiute a violation of the statute?
1. The literal import of the first section of the statute is, that the setting up of a gaming table, at which money or any other thing shall be bet, is a specific of-fence; and, consequently, that the keeping of such table may, if there he betting against it, he another act of Violation; and that keeping a hank, and either inducing or permitting any person to hot against it, is another, and different infraction of the statute. And this is the construction which we feel bound to give to the first section; hut we are not sure, that it is the one which was intended, Some doubt results from scrutinizing the whole section; hut principally, from the difficulty which we have felt, in discriminating any distinctive difference between setting up, and keeping a gaming table; and between a gaming table and a gamnig bank. To set up a gaming table, is to provide whatever may he necessary for the game, and either by acts or words, to propose to play it.
There is nothing like structure or erection in the. idea of setting up a gaming table, any more than building a house, is necessarily included in the idea of setting up a tippling house, or than making a road is indispensably connected with the power to establish a post road.
A man may set up a gaming table, without any table in a literal sense; or without having money or property to stake on the game, for his credit may he substituted, Simply setting out a table, or putting upon it, a pack of cards, would not be setting up a gaming table; a servant can do this, or any other person may do it merely for amusement, or for the accommodation of others, without having any agency, or participating at all, in any game which may he played. Even if a game be played, and he who sets out the table, and places on it the cards, participates in the game, and *181 wins or looses money, he may not be guilty of having setup a gaming table; he may be abetter against the bank. There must be a bank, and a banker, or a gaming table, and a keeper of it.
Abank,banker or keeper of “a gamingta-ble, defined.
Setting up a gaming table is no violation of the act of 1823, unloss a game be play-> ed, and something be bet.
The bank is a fund of money, or property, or credit, offered to be staked on all bets, which others may choose to make against the banker, on the game which he shall exhibit to eutice bets. He, who employs such a fund, for such a purpose, thereby sets up a gaming table, whether he deals his cards on a table or a bench. And virtually, he keeps the bank or gaming table, although some other person may win in his absence, but at his instance, deal the cards and manage the game for him. Qui fácil per alium fácil per se. He, who obtains license to keep a tavern, and for whom it is kept, may be-considered a tavern keeper, although another person, as his agent, may actually keep it.
Setting up a gaming table, is no violation of the statute, unless a game be played, and something be bet. To play a game,is the object of settingup; without such object, a gaming table cannot be set up within the prohibition of the statute. Such purpose is an indispensable constituent in the definition of the words, to i‘set up a gaming table.”
In substance, and effect, therefore, the man who sets up a gaming table, keeps a gaming table, and e converso the person who keeps, may, in one sense, be said to set up a gaming table pro hue vice. Therefore, there is much plausibility in the idea, that in using the words “shall set up, or shall keep a gaming tabic,” the legislature did not mean to designate distinct acts, but intended to be so explicit, as to prevent any evasion of their object. For example, if they had used only the words “shall setup a gaming table,” one person might in substance, set up the table and a different person might, inform, keep it; and the latter might, if indicted, insist, that he did not literally set it up, and exhibit proof accordingly, that another who, until then, kept behind the screen, was the setter up; and the like “loop' to hang a doubt upon,” might have been furnished, if the words “shall keep a gaming table” had been used. Then the real banker might insist, that he had not literally kept the bank. To prevent such a possible evasion, might have been the only motive for using these different descriptions, which may have been *182 deemed equivalent, and significant of the same tiling in effect: if so, then the construction should be the same, as it would be, if the language had been, “shall set up, or in other words, keep, &c.” This construction is somewhat fortified by the fact, that, in afterwards speaking of a bank, the act uses the expression “keep,” alone. Rut the construction, which we have given to these expressions, is in our opinion more rational and consistent, than that which we have just suggested.
There are noaccessaries to misd'emean-ors, alt who principals.316
A person may keep a gaming table, who has no interest whatever in it. He may barely deal the cards for the real banker. Such a person could not, with propriety, be considered as having set up the bank, or gaming table, according to the proper definition of that offence. But, by keeping the table or bank, and dealing the cards, he induces other persons to bet, and thereby occasions a breach of the law, and contributes to the mischief intended to be remedied.
There are no accessaries in misdemeanors; all who are guilty? are principals. Playing the game is not indispensable, to the setting up of a gamingtable; though it js essential to the legal guilt, attached to the setting UP* The table-must be set up; and also, something must-be bet on a game played on it. A man may, therefore, set up a gaming table, on which no game shall be played, but he cannot be convicted for a violation of the law, unless a game be played and something be bet upon it. Some person must, therefore, keep the table and deal the cards, if the game be a game of cards. If such person be not the person who set up the table, the latter may nevertheless be guilty of a clear violation of the law, in both its letter and spirit.
A person may keep a gaming table, who has no interest in its profits. And strictly speaking, a man could not be said to set up a gaming table, in which he had no interest, and which had been, in fact, set up by another. Literally, therefore, one person may set up a gaming table, and another person may keep it. As penal statutes are to be construed with a strictness, peculiar to themselves, the legislature supposed, that if they should only prohibit the setting up of a gaming table, the keeper of it might, by a literal construction, escape, if he were not the setter up in form, or the owner, or one of the owners of the table. Such an *183 one, should be as obnoxious to the penalty, as if he had actually “set up” the table; and therefore, the expression “or keep” was inserted; and,intended to designate a specific offence. Perhaps the man who sets up a gaming table, should always be considered as a keeper of it, but he may not be the only keeper; another may also, in fact, keep it for him; and this actualkeeper may not be, in fact, or in law, a setter up of the table. A per-ón may therefore, set up a table who, although, in law, must also “keep” it; may not, in fad, keep it; and one may, in fact, keep it, who neither, in law, nor in fact, set up, nor had any agency in setting it up*
To keep a bank, may be a distinct offence, if any thing be bet against it, and if the banker induce or permit such betting. These latter expressions in the act, are supererrogatory. They were used “abundante caitr tila.” For he. who keeps a bank, must necessarily induce, or permit the betting upon it. The act of offering the game induces, the act of playing it, permits betting.
But the expressions “induce or permit” apply also, to the two first classes of violation, to-wit: to set up, or keep a gaming table. This is evident, from the expressions following, to-wit: “said bank or game.” The said game must refer to gome antecedent game, which had been described. There is no other antecedent, than that found in the game of chance, mentioned as being played on the gaming table.
But this application of the term “game” does not change the construction, which should be given without it. Because, as he, who sets up a gaming table, does it foi; the purpose of making profit by bets on the game to be played on it, of course, generally, at least* if not universally, he must be considered as virtually inducing, or permitting the bets which shall be made upon it; and so must he be considered as inducing or permitting bets, who actually keeps the table or plays the game.
2. The foregoing considerations, dispose of nearly the whole of this proposition.- They have fixed the definition of the terms “set up” and “keep a gaming table,” and, therefore, partially answer the second question. But there is a further response, more immediately applicable to this case, and which, therefore, will now besuperadded.
"cards for a 'bank or gam■ ing table, although he hate no interest in the profits which may accrue A person, who deals the etoror setter" up of the 6r" bank, violates the act of’23.
The circuit court instructed the juiy, that to keep the gaining table, or in other words, to deal the cards, is not a violation of the statute, unless the dealer have an interest in the profits, which may accrue to the proprietor, or setter up of the table. In this opinion, we do not concur. We have already suggested some reasons for this dissent. We will now add another. All that the act requires to convict a person, for keeping a gaming table, is, that he shall keep it, and that with his permission, something shall he bet upon it. To constitute an infraction of the act, it is not necessary, ^eePer should bet; consequently, it is not essential, that he should have any interest in the game, Besides, the end designed to he accomplished, might be often and easy frustrated, if the keeper of the hank, or the dealer of the cards, should not he held responsible, unless he bet or had an interest in the bets. lie, who keeps the bank and tempts others to bet, and who, thereby, occasions loss of time, of morals and of property, perhaps of reputation and happiness, is morally as guilty, as the person for whose benefit he gratuitously* Mi m- and from wantonness, or. courtesy, or friendship, duced” and “permitted” the disastrous betting, and kept the prohibited gaming table; and it is as just, and as necessary, that such a volunteer, in the violation of law, should be held liable to its penal sanction. Moreover, if such volunteer, or an agent for stipulated hire* should be suffered to escape, how easy would it be to felude the statute, and how difficult to enforce it. The beneficiary or employer, or more properly, the principal would conceal himself, from observation, while his puppet plays his part in trampling on the law for him, and in pocketing for him, the spoil. Here, the maxim that all are principals in misdemeanors, applies. It is no answer, to say that, by prosecuting the agent, the principal may be exposed. He might then he irresponsible; and besides such circuity and delay are inconsistent with the letter, the spirit and the acknowledged policy of the statute. To manage and control the table, and deal the cards, is to keep a Faro bank.
3. But the last inquiry, although chiefly answered, is not yet fully solved. Its solution will decide this 'case. Does a person “set up or keep a gaming table,” who has no interest whatever in it, nor any agency in ’it* or in tbe game which shall be played upon it, other *185 iban by a momentary, or occasional .assistance to the dealer, in taking in or paying bets? He does not, either, according to the letter or object of the statute, or to the popular understanding of the terms, “to set up or (o keep a gaming table.” The letter of the act does not embrace him; its policy cannot. Taking up money won by the bank, and handing it to the banker, is not setting up a gamingtable; andsdrely this alone is not keeping a gaming table. A person may do this, who bets nothing; who did not encourage others to bet, and who not only had no interest in the game, but did not even understand it. Such a person could not therefore, keep the bank or gaming table; and he could not be guilty of setting it up directly or indirectly, because he had no interest in it, and was not present when it was set up. If the legislature intended to inflict a penalty of §500, for a simple courtesy or inad-verlence of this kind, they have unacc ountably pre-termitted one class of persons, who are much greater offenders; the betters. These are parties; without them, no bank can be kept; no game can be played; no money won. They encourage the setting up and keeping of gaming tables, by betting on them. But generally, they are stationary. Those who set up or keep gaming tables, are generally itinerant, going about hunting for victims. The legislature thought lit to act on these; and thus, save others by keeping them out of temptation.
A person who has no interest in a gaming table, nor agency in the game played', but affords a momentary or occasional assistance tó the dealer, does not violate the statute.
If a better against a Faro bank, and who has no interest in the bank, or agency in keeping it, deliver his money to the banker when he shall loose, and take it from his bank, when he shall win, is he thereby a setter up or keeper of the bank?' Suppose all the betters do the same for the convenience of the banker, and at his request, do they thereby become parties to the setting up or keeping of the gaming table?
If such acts would not constitute a better against thé bank, a setter up or keeper of the table, a fortiori, the same acts, done by a person wiio does not bet, could not implicate him. Playing the game, or dealing the cards at faro, is keeping the gaming table. It is this, that tempts betting and occasions the injury, which the act of 1823 intended to prevent; and any person who does this, violates the law, vyhatever motive may have acta- *186 ated him. It is the act and its consequmces, which con» stitute the offence, and not the intention of the actor. This, in such a case, is not a fit subject of investigation.. Money cannot be won, unless some person keep the table, and manage the game. But the table may be kept, although the keeper may not himself pay out or receive the bets won or lost.
Benny, attorney general, and Charles S. Bibb, for commonwealth; Ííaggin, for defendant.
In this case, the conduct of Burns furnished legitimate evidence to prove, that he set up or kept the gaming table, or in other words, that he was a party to it. But the jury have decided, that this evidence was insufficient. In such a case, this court will not reverse the judgment, merely because, the deductions by the jury, from the facts, may have been liberal and charitable to the defendant. The facts proved do not, “per se,” constitute an offence prohibited by the statute. There was no evidence proving, or conducing to prove, that Burns set up or kept the table, unless the jury had believed, as they certainly might have done, that he was interested in it; and, therefore, the judgment should not be reversed for any error, in the opinion of the circurt judge, that dealing the cards, was not, of itself, keeping the gaming table. For there was no evidence, that Burns did deal; and therefore, this error, was abstract and immaterial. Unless he was interested therefore, (and the jury, whom we will not control in this case, decided, that he was not) Burns did nothing which could render him, in contemplation of law, an aider or abetter of him who did set up and keep the table.
Wherefore, the judgment of the circuit court is affirmed.,